171 P.3d 610

**REGAL HOMES, INC., an Arizona corporation; Auto–Owners Insurance Company, Plaintiffs/Appellants,**

v.

**CNA INSURANCE; Transportation Insurance Company; Valley Forge Insurance Company, Defendants/Appellees.**

No. 1 CA–CV 05–0254.

Court of Appeals of Arizona, Division 1, Department D.

Nov. 29, 2007.

Review Denied June 3, 2008.

Rai & Barone, P.C. By Rina K. Rai, Robertson Clark, L.L.P. By Robert N. Clark, Phoenix, Attorneys for Plaintiffs–Appellants.

Richards Law Office, P.C. By Charles F. Richards, Carolyn R. Tatkin, Phoenix, Attorneys for Defendants–Appellees.

### OPINION

GEMMILL, Chief Judge.

¶ 1 In this appeal we address several insurance coverage issues arising from alleged construction-defect litigation. In 2000, Regal Homes, Inc. ("Regal") and Auto–Owners Insurance Company ("Auto–Owners") (collectively "Appellants") filed their complaint against Appellees CNA Insurance, Transportation Insurance Company, and Valley Forge Insurance Company (collectively "CNA").[1] This is the second appeal in this case. In the first appeal, we determined that the trial court had improperly granted summary judgment to CNA and we remanded for further proceedings. *Regal Homes, Inc. v. CNA Insurance*, 1 CA–CV 02–0202 (Ariz.App. May 15, 2003) (mem.Decision).

¶ 2 After remand from the first appeal, additional discovery was accomplished and CNA again moved for summary judgment. The trial court granted CNA's motion. Appellants seek reversal of the summary judgment.[2] For the reasons that follow, we affirm in part, reverse in part, and remand.

### FACTS AND PROCEDURAL HISTORY

¶ 3 Regal was the builder and developer of a single family residential community known as "The Shores." Regal obtained primary commercial general liability ("CGL") insurance coverage directly from Auto–Owners for 1995 and from Zurich Companies ("Zurich") for 1996 through 1998. Regal hired GMS Concrete, Inc. ("GMS") as a subcontractor to perform work on The Shores. Regal had an oral understanding with GMS, but no written agreement, regarding the procurement of additional coverage for Regal. GMS was insured by CNA,[3] and Regal was identified in certificates of insurance as an additional insured under the CNA policies.

¶ 4 Regal was sued in superior court by eight homeowners from The Shores ("*Bootz* litigation" or "*Bootz* "). Zurich and Auto–Owners participated in the defense and settlement of the *Bootz* litigation. Regal re-

---

1. CNA is a service mark for a group of insurers that includes the other Appellees. It appears from the record that the name of the company that issued the pertinent CNA policies is probably Transcontinental Insurance Company rather than Transportation Insurance Company.

2. The summary judgment for CNA was a partial judgment certified as a final judgment pursuant to Rule 54(b) of the Arizona Rules of Civil Procedure. Appellants' remaining claims against defendant GMS Concrete, Inc. were subsequently reduced to a final judgment in favor of GMS, which has not been appealed and is final.

3. The original CNA policy was issued to G & G Concrete Specialists, Inc. GMS is the successor-in-interest to G & G.

quested that CNA participate in the defense, but CNA refused. CNA asserted that its policies provided only excess coverage for Regal. The *Bootz* litigation was settled with funds contributed by Auto–Owners, Zurich, and Regal. Neither Auto–Owners nor Zurich exhausted its primary policy limits of coverage.[4]

¶ 5 Appellants' claim is that the CNA coverage was primary, not excess, and that CNA should provide reimbursement for defense costs and indemnity payments. In our prior decision, we held that a disputed issue of fact existed as to whether CNA's coverage was primary or excess. The pertinent portion of CNA's blanket additional insured endorsement, issued to GMS, provides:

> The insurance provided to the additional insured is limited as follows:
>
> 1. That person or organization is only an additional insured with respect to liability arising out of:
>
> . . . .
>
> b. "Your work" for that additional insured by or for you.
>
> . . . .
>
> Any coverage provided hereunder shall be excess over any other valid and collectible insurance available to the additional insured whether primary, excess, contingent or on any other basis unless a contract specifically requires that this insurance be primary or you request that it apply on a primary basis.[5]

¶ 6 In our prior decision, we determined that CNA was not a primary carrier of Regal on the basis of GMS requesting that the CNA coverage be primary. In other words, there is no evidence that GMS specifically asked CNA to provide *primary* additional

insured coverage for Regal. We also concluded, however, that Regal had presented sufficient evidence to raise a genuine issue of material fact regarding whether "an oral contract may have existed between GMS and Regal, making the CNA policy primary."

¶ 7 Following remand, CNA again moved for summary judgment, which was granted. We have jurisdiction over this appeal by Regal and Auto–Owners by virtue of Arizona Revised Statutes ("A.R.S.") sections 12–120.21(A)(1) and –2101(B) (2003).

## ANALYSIS

¶ 8 On review of summary judgment, we view all facts and inferences in the light most favorable to the parties against whom judgment was entered. *Case Corp. v. Gehrke,* 208 Ariz. 140, 143, ¶ 10, 91 P.3d 362, 365 (App.2004). Appellants raise the following issues on appeal:

1. Did CNA owe a duty to defend and indemnify Regal in the *Bootz* litigation?

2. Did a disputed issue of material fact exist regarding an oral contract between Regal and GMS that specifically required CNA's additional insured coverage to be primary?

3. Did CNA's policy language conflict with the "other insurance" provisions in Regal's direct primary insurers' policies, with the result that the conflicting clauses were rendered inoperative?

4. Did a genuine issue of material fact exist as to whether CNA committed bad faith?

---

4. In ¶ 21 of this court's May 15, 2003 Memorandum Decision, we noted that the *Bootz* litigation settled for $3,464,801 and that the policy limits for Auto–Owners and Zurich were both $1,000,000 (although Zurich provided coverage for three policy years). Based on the limited record available, the court observed that $1,464,801 fell outside of the primary policy limits. It appears the court assumed that Auto–Owners and Zurich had each contributed policy limits of $1,000,000 toward settlement of the *Bootz* litigation. This assumption was incorrect. The record is now more fully developed, and Regal and Auto–Owners have conceded that nei-

ther Auto–Owners nor Zurich exhausted its primary coverage limit. The conclusions stated in ¶¶ 21–22 of our prior decision, based on the incorrect assumption that Auto–Owners and Zurich had exhausted their primary limits, are not applicable.

5. We quote from the only additional insured endorsement for the CNA policies in the record, effective from October 1, 1997 to October 1, 1998. No party contends that the language differed in the endorsements for prior coverage years.

## Effect of Summary Judgment in Favor of GMS

¶ 9 We first consider whether the issues presented in this appeal are affected by the grant of summary judgment to GMS. If, as CNA asserts, the determination that GMS was free from liability for the damages suffered by the *Bootz* homeowners eliminates CNA's coverage entirely, we need not reach the remaining issues.

¶ 10 Appellants sued GMS on claims for common-law indemnity and implied warranty. GMS sought summary judgment on the basis that Appellants' claims were barred by issue or claim preclusion. That is, GMS had been exonerated from any fault in litigation involving the same parties and same issues, and Appellants were therefore precluded from re-litigating that issue. *See Matusik v. Ariz. Pub. Svc. Co.*, 141 Ariz. 1, 3, 684 P.2d 882, 884 (App.1984) (explaining that, between the parties or those in privity with the parties, the determination of a litigated fact that is essential to a valid and final judgment is conclusive in a subsequent claim). The facts presented in support of GMS's motion were as follows.

¶ 11 GMS orally contracted with Regal to provide services at The Shores that included backfilling of trenches around foundation walls and over utility trenches. The claims in *Bootz* were brought by seven homeowners who alleged that water was infiltrating their homes as a result of improper compaction of backfill around the foundation walls and over the utility trenches. After the *Bootz* litigation was settled, three additional homeowners brought suit for the same deficiencies ("*Rivera*"). Regal cross-claimed in the *Rivera* litigation against GMS for indemnity. The *Rivera* case proceeded to trial, and the jury found Regal to be one hundred percent at fault for the water infiltration and GMS to be free from fault. The court then entered judgment in favor of GMS and against Regal on the cross-claim for indemnity.

¶ 12 GMS asserted in its motion for summary judgment in this case that the claims in *Bootz* and *Rivera* were identical and thus Appellants were precluded from re-litigating GMS's fault. CNA joined in GMS's motion because, they argued, a judgment in favor of GMS would "conclusively establish the fact that no causal nexus exists" between the work of GMS and the damages suffered by the *Bootz* plaintiffs. The trial court granted summary judgment to GMS, and a final judgment was entered from which no appeal was taken. We therefore regard it as established that GMS is not at fault for the defects suffered by the *Bootz* homeowners.

¶ 13 Because GMS has no liability to the *Bootz* plaintiffs, CNA asserts that it had no duty to defend or indemnify Regal because there is no causal connection between GMS's work and Regal's liability sufficient to confer coverage under the additional insured endorsement.

¶ 14 Although the *Rivera* judgment establishes either the absence of fault on the part of GMS or the absence of proximate cause or both, the test for additional insured coverage under the CNA policies is different. Appellants contend that coverage exists under the "arising out of" language of the endorsement without regard to a final determination of fault and therefore the exoneration of GMS from liability does not automatically preclude coverage by CNA. They assert that the "arising out of" language of the policy requires only a causal nexus—but not proximate cause—between GMS's work and the flooding in the homes. We agree with Appellants.

¶ 15 CNA's additional insured endorsement provides that Regal is an additional insured only with respect to liability "arising out of" GMS's work for Regal.[6] The general rule is that the words "arising out of" are "broad, general, and comprehensive terms effecting broad coverage." *Farmers Ins. Co. v. Till*, 170 Ariz. 429, 430, 825 P.2d 954, 955 (App.1992); *see also Transp. Indem.*

---

6. The CNA additional insured endorsement provides:

The insurance provided to the additional insured [Regal] is limited as follows:
1. [Regal] is only an additional insured with respect to liability *arising out of:*

. . . .
(b) "Your work" for that additional insured by or for you.
(Emphasis added.) Additionally, "[y]our work" is defined as "[w]ork or operations performed by [GMS]."

*Co. v. Carolina Cas. Ins. Co.*, 133 Ariz. 395, 399, 652 P.2d 134, 138 (1982) (explaining that phrase "arising out of" in insurance policy did not require traditional proximate cause); *Brenner v. Aetna Ins. Co.*, 8 Ariz.App. 272, 276, 445 P.2d 474, 478 (App.1968) (same).

¶ 16 In *Transport Indemnity*, the insurer argued, as CNA does here, that its policy provided no coverage because the acts of its insured did not cause the accident and therefore the claim was not one "arising out of" the occupation of the named insured, as required for coverage under that policy. *Transp. Indem. Co.*, 133 Ariz. at 399, 652 P.2d at 138. Our supreme court rejected this argument and held that the occurrence "arose out of" the insured's business because there was a causal nexus sufficient to warrant the conclusion that the accident was "incident to or connected with" the use of the vehicle in the business of the named insured. "The causal connection required is *not proximate cause*; i.e., the business of the named insured need not have caused the occurrence, it need only be related to it." *Id.* at 399, 652 P.2d at 138 (emphasis added); *see also Meadow Valley Contractors, Inc. v. Transcon. Ins. Co.*, 27 P.3d 594, 597 (Utah App. 2001) (holding, under an additional insured endorsement similar to CNA's endorsement here, that the commonly understood meaning of the words "arising out of" requires only some causal relationship between the injury and the risk for which coverage was provided).

¶ 17 We conclude, therefore, that the determination of no fault or liability on the part of GMS does not resolve the question whether Regal's alleged liability to the *Bootz* plaintiffs "arose out of" GMS's work, a necessary prerequisite to coverage under the CNA policies. The extent of the causal connection necessary to satisfy the "arising out of" requirement is less than that required for proximate cause.

¶ 18 We decline to rule as a matter of law on whether Regal's liability "arose out of" GMS's work. On remand, Auto–Owners will have the burden of establishing that Regal's alleged liability to the *Bootz* homeowners "arose out of" GMS's work for Regal.

¶ 19 As additional guidance for the court and parties on remand, we note that a distinction should be drawn between the duty to defend and the duty to indemnify. "The duty to defend ... is not the same as the duty to indemnify. The duty to defend arises at the earliest stages of litigation and generally exists regardless of whether the insured is ultimately found liable." *INA Ins. Co. of N. Am. v. Valley Forge Ins. Co.*, 150 Ariz. 248, 255, 722 P.2d 975, 982 (App.1986). In evaluating whether CNA had a duty to defend, the question whether the alleged liability of Regal "arose out of" GMS's work must be determined initially from the allegations in the complaint against Regal and the facts known at that time. *See Kepner v. W. Fire Ins. Co.*, 109 Ariz. 329, 331, 509 P.2d 222, 224 (1973) (discussing when the duty to defend arises). It is possible that the requisite nexus ("arising out of") could be established for the duty to defend but not for the duty to indemnify. *See Lennar Corp. v. Auto–Owners Ins. Co.*, 214 Ariz. 255, 261, ¶ 11, 151 P.3d 538, 544 (App.2007) ("[T]he insurer would have the duty to defend a suit alleging facts that, if true, would give rise to coverage, even though there would ultimately be no obligation to indemnify if the facts giving rise to coverage were not established. Thus, pursuant to such policy language, the obligation to defend a suit may be broader than the obligation to indemnify.").

¶ 20 We turn now to the additional issues presented by this appeal. In addressing these issues, we necessarily assume *arguendo* that the requisite causal nexus has been established. We begin with the question whether the additional insured coverage provided by CNA for Regal is primary or excess coverage.

**Existence of a Contract between Regal and GMS "Specifically Requiring" CNA Coverage to be Primary**

¶ 21 The first appeal in this matter arose from the trial court's grant of CNA's motion for summary judgment based upon this language in its additional insured endorsement: "Any coverage provided hereunder *shall be excess* over any other valid and collectible insurance available to the additional insured

whether primary, excess, contingent or on any other basis *unless a contract specifically requires that this insurance be primary* or you request that it apply on a primary basis." (Emphasis added.) CNA argued in its first motion for summary judgment that there was no contract requiring coverage to be primary. In opposing summary judgment, Regal submitted the affidavit of its president, Thomas Brown, who stated that "Regal Homes did in fact request that subcontractors obtain additional insured endorsements in favor of Regal Homes and that such endorsements would be treated as primary as opposed to excess." This court's prior decision noted that Brown's affidavit was uncontradicted and provided evidence of an oral contract between GMS and Regal that the CNA coverage was to be primary, and we remanded for further factual development.

¶ 22 Following remand, Brown's deposition was taken and this issue was explored at length. He testified that "[w]e've always had agreements with all of our subcontractors. If there's a problem, you better have [Regal] insured, have us covered." Brown asserted that GMS failed "to have proper insurance to step up and cover me on this." He stated that, "all along, ever since [GMS was] doing work for me … [Regal] was supposed to be covered by their insurance. If there was a problem, it was their responsibility or their doing to do. That was their failure." Brown stated that the additional insured coverage was supposed to have "Regal insured along with them so if something happens, Regal is covered." Brown believed that when Regal first started over 20 years ago, he told all of his subcontractors that he wanted to work with insured subcontractors so that, if the subcontractors did something wrong, they have insurance and Regal has insurance too. He stated subcontractors were supposed to "have insurance in place that would cover whatever the problem came out of their work…."

¶ 23 Brown admitted that he was not familiar with and did not use words such as "excess" and "primary" coverage when working with subcontractors. But when he told a subcontractor to make sure there was insurance to cover the subcontractor and Regal, he explained that "this isn't something that's going to come after me. It's there. They're the ones that's going to be involved in the problem. We gotta have the insurance cover them and me to take care of the problem."

¶ 24 Brown acknowledged that this was his "assumption" because that was the coverage he had wanted from "day one."

[W]ell, I've known that there's insurance that people can get that if they're working on the job, for example, and my guy—I have insurance, too, and something happens with a problem, then I will follow up and take care of their work, but this is not what I wanted. When I started in business, I wanted my subcontractors to be sure that if they have a particular problem that caused damage and gets me involved in it, I'm going to be covered, and we used the word … primary insurance…. I mean I don't know what the relationship of that is [referring to primary and excess], but that's the kind of insurance I wanted, and I never worried about my people having to pay for somebody else's problems.

Brown "knew that when you go out there and you have a problem, that you gotta make sure that you're covered, and … the person who is responsible for that problem [has] to have you insured because there's some way you're going to get involved in that."

¶ 25 Brown also stated that he had insurance discussions with GMS management as it changed over the years:

[A]nybody that's worked for us—this has been—of course, as time goes on, it's become more and more important, but we've always been under this, that if it's the type of insurance we wanted, that was the end of it. We didn't discuss, you know, how much the policy cost or how long they're going to be in effect. We just go by the endorsement and make sure we have the coverages in place for the contractors that were working for us.

Brown's testimony was not contradicted.

¶ 26 CNA focuses on Brown's admission that he did not say he wanted the subcontractors' insurance to be "primary" and was not familiar with those terms. Although CNA concedes that use of the magic word

"primary" is not essential to establish a contract requiring primary coverage, CNA argues that Regal could not establish that a contract existed that "specifically require[d]" CNA's additional insured coverage for Regal be primary because there was no written contract, Brown could not differentiate between excess and primary coverages, and he admitted he was expecting and assuming that subcontractors such as GMS would provide the appropriate insurance for Regal. CNA also asserts that Brown's testimony fails to establish the existence of a contract because the record lacks evidence of an offer and an acceptance necessary to form a contract requiring primary insurance.

■ ¶ 27 We held in the first appeal that Brown's uncontradicted affidavit was sufficient evidence of an oral contract specifically requiring primary coverage within the meaning of the CNA additional insured endorsement to defeat summary judgment. Brown's post-remand deposition testimony on this issue, however, significantly amplifies and clarifies the record and effectively displaces his affidavit. *Cf. Orme Sch. v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990) (stating that affidavits which "tend to contradict the affiant's sworn testimony at deposition [are] insufficient to withstand a motion for summary judgment.").

¶ 28 Brown's testimony is insufficient to raise a disputed fact issue regarding whether an oral contract existed that "specifically required" CNA's additional insured coverage of Regal to be primary. After indulging all inferences in Appellants' favor, we conclude that no question of material fact remains on this issue.

■ ¶ 29 It is undisputed that that GMS did in fact procure additional insured coverage for Regal. Doing so constituted performance of an apparent oral agreement to procure additional insured coverage. The dispute is over the terms of that contract: did the agreement "specifically require" that the additional insured coverage for Regal be primary? "It is elementary that for an enforceable contract to exist there must be an offer, an acceptance, consideration, and *sufficient specification of terms so that the obligations involved can be ascertained.*" *Savo-*

*ca Masonry Co. v. Homes & Son Const. Co.*, 112 Ariz. 392, 394, 542 P.2d 817, 819 (1975) (emphasis added). We find no specification that the oral contract between GMS and Regal required CNA's coverage to be primary. Brown's testimony would not support the conclusion by a rational trier of fact that an oral contract existed that "specifically require[d]" CNA to provide primary coverage for Regal. *See Hartford Fire Ins. Co. v. Lo Brutto*, 275 A.D.2d 525, 711 N.Y.S.2d 639, 640 (N.Y.App.Div.2000) ("The flaw in plaintiffs' argument is that CNA's policy clearly and unambiguously provides excess coverage for [the general contractor] unless the subcontract 'specifically requires' that the coverage be primary. Thus, it is the absence of any specific requirement of primary coverage in the subcontract that is relevant to the concurrent coverage issue, rather than the absence of any specific provision that the coverage be excess.").

¶ 30 We therefore conclude that summary judgment was properly granted on this issue and that the additional insured coverage provided by CNA to Regal is excess coverage unless some other reason exists to make the coverage primary instead of excess.

### The Effect of Auto–Owners' Other Insurance Provision

■ ¶ 31 We next analyze the relative positions of Auto–Owners and CNA during 1995. Auto–Owners provided direct primary coverage for Regal during 1995. The CNA coverage for Regal during 1995 will be excess unless Appellants prevail on their argument that the policies contain mutually repugnant "other insurance" provisions. *See Harbor Ins. Co. v. United Servs. Auto. Ass'n*, 114 Ariz. 58, 63, 559 P.2d 178, 183 (App.1976) (holding that if two otherwise applicable policies contain mutually repugnant other insurance clauses, the clauses must be disregarded).

¶ 32 Before analyzing the "other insurance" provision from Auto–Owners policy, we first address CNA's argument that its pertinent language is found in its additional insured endorsement, not in a provision expressly entitled "Other Insurance." CNA

therefore suggests its language is not a true "other insurance" provision and we should not compare its language with the "other insurance" clause in the Auto–Owners policy. But it is the substance of the language at issue, not its title or form, that determines whether it is an "other insurance" provision. Our supreme court has explained that "other insurance" clauses "seek 'to limit or eliminate coverage under the policy in the event the insured has other insurance available.'" *Fremont Indem. Co. v. New England Reinsurance Co.*, 168 Ariz. 476, 477, 815 P.2d 403, 404 (1991) (quoting ALLAN D. WINDT, INSURANCE CLAIMS & DISPUTES § 7.01, at 386 (2d ed.1988)). We conclude, therefore, that the paragraph in CNA's additional insured endorsement constitutes an "other insurance" provision that must be considered alongside Auto–Owners' "other insurance" clause.

¶ 33 Appellants assert that the CNA additional insured endorsement and the "other insurance" provision in the Auto–Owners policy are contradictory and cannot be reconciled, with the result that both clauses should cancel each other out and CNA's coverage should be co-primary with Auto–Owners' coverage. The problem with Appellants' argument, however, is that they have mistakenly relied on only a portion of the entire "other insurance" provision from the Auto–Owners policy, and the particular portion relied upon is intended to determine how Auto–Owners would share coverage with other insurers when Auto–Owners provides *excess* instead of *primary* coverage.[7] We conclude, in other words, that Appellants' argument is not supported by the "other insurance" provision in the Auto–Owners policy when read as a whole. We find no contradiction between the "other insurance" language in CNA's endorsement and the "other insurance" provision in the Auto–Owners policy. Thus, we reject Appellants' contention that CNA was a co-primary insurer of Regal, along with Auto–Owners, for 1995.

■ ¶ 34 For 1995, therefore, Auto–Owners provided Regal with direct primary CGL coverage and CNA provided additional insured coverage for Regal that was excess to the Auto–Owners coverage. Because the primary coverage of Auto–Owners was not exhausted, CNA's excess coverage was not triggered. "Until a primary insurer offers its policy limit, the excess insurer does not have a duty to evaluate a settlement offer, to

7. In the "Other Insurance" provision of the Auto–Owners' policy, we have italicized the language upon which Appellants rely:

 If other valid and collectible insurance is available to the insured for a loss we cover . . ., our obligations are limited as follows:
 a. Primary Insurance
 This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.
 b. Excess Insurance
 This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:
 (1) That is Fire, Extended Coverage, Builder's Risk, installation Risk or similar coverage for "your work";
 (2) That is Fire insurance for premises rented to you; or
 (3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft. . . .
 When this insurance is excess, we will have no duty . . . to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so but we will be entitled to the insured's rights against all those other insurers.

 When this insurance is excess over any other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:
 (1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and
 (2) The total of all deductible and self-insured amounts under all that other insurance.
 *We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.*
 c. Method of Sharing
 If all other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.
 If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits of insurance to the total applicable limits of insurance of all insurers.

participate in the defense, or to act at all." *Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, 256, ¶ 18, 63 P.3d 282, 287 (2003).

### The Effect of Zurich's Other Insurance Provision

■■■ ¶ 35 We turn now to the years 1996 through 1998, when Regal's direct primary CGL coverage was provided by Zurich. Appellants contend that CNA's additional insured endorsement conflicts with the "other insurance" provision in Zurich's policy, with the result that the excess language in both policies must be ignored, rendering both insurers co-primary. Before we reach this issue, however, CNA argues that Appellants lack standing to claim any benefit against CNA based on the Zurich policies.

¶ 36 Zurich is not a party to this action, and we might agree with CNA's lack of standing argument if Appellants were attempting to stand in Zurich's shoes and recover for payments made by Zurich. But Appellants have acknowledged that they cannot assert any rights held by Zurich, and Appellants are not seeking to recover from CNA for any payments made by Zurich to defend or settle the *Bootz* litigation.

¶ 37 Appellants seek recovery from CNA resulting from CNA's refusal to participate in the defense and settlement of the *Bootz* litigation. They contend that in order to fully determine the rights and obligations of CNA toward its additional insured, Regal, the "other insurance" provision in the Zurich policies must be considered alongside the other insurance language in the CNA endorsement. We agree. We cannot complete the analysis of the CNA coverage for Regal without considering the potential impact of the competing other insurance provisions in the Zurich and CNA policies. We do not perceive this to be a standing issue, nor do we think that Appellants lack standing here. We therefore address the merits of Appellants' contention.

■■■ ¶ 38 Zurich was the direct primary CGL insurer of Regal during the years 1996 through 1998. Regal was also an additional insured of CNA during this time period. As already noted, the last paragraph of CNA's additional insured endorsement provides:

> Any coverage provided hereunder shall be excess over any other valid and collectible insurance available to the additional insured whether primary, excess, contingent or on any other basis. . . .

¶ 39 Zurich's policies also have an "other insurance" provision that seeks to make its coverage excess over any insurance provided to Regal as an additional insured:

> This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis: . . . (4) That is available to the insured as an additional insured. . . .

We cannot give effect to both provisions. That is, CNA and Zurich cannot simultaneously be excess carriers of Regal for the years 1996 through 1998, while neither serves as a primary carrier of Regal. "When more than one policy contains an 'other insurance' provision . . . courts must resolve the resulting battle of semantics over which clause, if any, will be given effect over the other." *Fremont*, 168 Ariz. at 478, 815 P.2d at 405. "[W]here two policies cover the same occurrence and both contain 'other insurance' clauses, the excess insurance provisions are mutually repugnant and must be disregarded." *Harbor Ins. Co.*, 114 Ariz. at 63, 559 P.2d at 183.

¶ 40 Applying these principles, we conclude that the "other insurance" clauses contained in the Zurich and CNA policies are mutually repugnant and therefore must be disregarded. As a result, Zurich and CNA were co-primary insurers of Regal during 1996 through 1998. The same result was reached in the only two other published appellate court opinions known to us that compare "other insurance" language in an additional insured endorsement with the "other insurance" provision in the insured's direct primary CGL policy. *Ohio Cas. Ins. Co. v. Oak Builders, Inc.*, 373 Ill.App.3d 997, 312 Ill.Dec. 1, 869 N.E.2d 992, 994–97 (2007) (finding general contractor's CGL coverage and additional insured coverage from subcontractor's insurer to be co-primary because of mutually repugnant "other insurance" provisions);

*Perniciaro, Jr. v. Liberty Mut. Ins. Co.*, 825 So.2d 1221, 1222–23 (La.App.2002) (same).

### Effect of CNA Being Co-Primary with Zurich

 ¶ 41 All three primary insurers of Regal—Auto–Owners, Zurich, and CNA—had a duty to defend Regal against the claims in the *Bootz* litigation. The policies of all three insurers were "occurrence" policies. The *Bootz* plaintiffs alleged various occurrences during the four-year period from 1995 through 1998. In *Western Casualty & Surety Company v. International Spas of Arizona, Inc.*, 130 Ariz. 76, 634 P.2d 3 (App. 1981), this court held that "if any claim alleged in the complaint is within the policy's coverage, the insurer has a duty to defend the entire suit, because it is impossible to determine the basis upon which the plaintiff will recover (if any) until the action is completed." *Id.* at 79, 634 P.2d at 6; *see also Lennar Corp.*, 214 Ariz. at 261, ¶¶ 12, 15, 151 P.3d at 544 (explaining that duty to defend arises from allegations against insured and results in duty to defend entirety of action against insured). Therefore, even though Auto–Owners covered Regal for only one year while Zurich and CNA provided three years of primary coverage, each had the duty to defend the entirety of the action. *Id.* CNA refused to defend Regal, however, asserting that it was an excess carrier and not required to participate in the defense.

 ¶ 42 Auto–Owners argues that if CNA had participated in the defense of Regal, then Auto–Owner's defense costs would have been reduced. Auto–Owners therefore seeks contribution from CNA for a portion of its expenditures for Regal's defense. "Under the principle of equitable subrogation, the insurer which has performed the duty to provide a defense to its insured should be able to compel contribution for a share of the cost of defense from another insurer who had a similar obligation to the same insured but failed to perform it." *Nat'l Indem. Co. v. St. Paul Ins. Co.*, 150 Ariz. 458, 459, 724 P.2d

544, 545 (1986). Because CNA had a duty to defend Regal and did not do so, a question of fact exists as to whether and to what extent Auto–Owners' defense costs would have been decreased if CNA had joined in the defense of Regal. Therefore, summary judgment was improper on the issue of Auto–Owners' claim for reimbursement of defense costs.

¶ 43 Several methods have been applied by various courts to apportion defense costs among primary insurers.[8] We decline to determine at this time the appropriate method of allocation of defense costs in this dispute. We remand for further factual development and legal analysis of this issue. If Auto–Owners can establish that it has paid more in defense costs than its fair share compared to CNA, then it may recover the excess amount from CNA.

¶ 44 To the extent that Auto–Owners is claiming a right to reimbursement of any portion of its indemnity payment to help settle the *Bootz* claims, we affirm summary judgment in favor of CNA. As discussed above, CNA's coverage for 1995 was excess to Auto–Owners' coverage, and Auto–Owners' policy limit was not exhausted.

 ¶ 45 With respect to Regal, although we hold that CNA was a co-primary insurer of Regal during the years 1996 through 1998, this holding does not disturb the summary judgment entered against Regal. Unlike Auto–Owners, Regal is not seeking defense costs. Regal is seeking contribution from CNA for the amount Regal contributed "out of its own pocket" that it has not been able to recoup. However, Regal acknowledges that neither Zurich nor Auto–Owners exceeded its policy limits in settling the *Bootz* litigation. Although Regal was free to contribute to the *Bootz* settlement out of its own funds, it is far too speculative to assert that had CNA been involved in the defense of Regal, then Regal would not have contributed any money, or as much money, to help settle the *Bootz* claims. Regal enjoyed primary cover-

---

8. For a discussion of several apportionment methods, see *Centennial Ins. Co. v. U.S. Fire Ins. Co.*, 88 Cal.App.4th 105, 105 Cal.Rptr.2d 559, 562–64 (2001) (describing six approaches identified as the equal shares, time on the risk, policy limits, combined policy limit time on the risk, premiums paid, and maximum loss methods); *see also* ALLAN D. WINDT, INSURANCE CLAIMS & DISPUTES §§ 4:45, 7:6 (discussing the allocation of defense costs among insurers).

age from two carriers, Zurich and Auto–Owners, and neither exhausted the available primary policy limits. On the record in this case, Regal must be considered to have voluntarily chosen to contribute toward the settlement. It may have done so, as CNA argues, because certain non-covered claims were asserted by the *Bootz* plaintiffs. But we need not reach the issue of why Regal contributed to the settlement because Regal has not set forth facts establishing that CNA's participation in the defense would have resulted in Regal contributing less money to the settlement. *See Zuniga v. City of Tucson,* 5 Ariz.App. 220, 223, 425 P.2d 122, 125 (1967) ("On appeal, the appellant has the burden of demonstrating to this court that there was error committed below and upon failure to do so, this court has no alternative but to affirm."). We additionally note that a well-respected treatise asserts that, under similar circumstances, the insured has suffered no consequential damages. Allan D. Windt, Insurance Claims & Disputes § 4:10, at p. 4–117 ("In no event, however, particularly in a case … in which the suit was settled and there was no allegation that the insurer that defended did not provide a proper defense, can an insurer's refusal to defend result in any consequential damages to the insured.").

¶ 46 CNA is therefore entitled to summary judgment regarding the claims of Regal for reimbursement of money paid to help settle the *Bootz* litigation.

**Bad Faith and Punitive Damages Claims**

¶ 47 The trial court also granted summary judgment to CNA on Appellants' bad faith claim, which is based upon CNA's refusal to defend and indemnify Regal or to investigate Regal's tender of defense more diligently. Appellants assert that disputed issues of material fact preclude summary judgment on this claim.

¶ 48 We disagree. In addressing the tort of bad faith, our supreme court has stated:

"To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for

denying the claim. It is apparent, then, that the tort of bad faith is an intentional one.

The tort of bad faith can be alleged only if the facts pleaded would, on the basis of an objective standard, show the absence of a reasonable basis for denying the claim, i.e., would a reasonable insurer under the circumstances have denied or delayed payment of the claim under the facts and circumstances."

Under the *Anderson* standard an insurance company may still challenge claims which are fairly debatable. The tort of bad faith arises when the insurance company intentionally denies, fails to process or pay a claim without a reasonable basis for such action.

*Noble v. Nat'l Am. Life Ins. Co.,* 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981) (quoting *Anderson v. Cont'l Ins. Co.,* 85 Wis.2d 675, 271 N.W.2d 368, 376–77 (1978)) (citation omitted).

¶ 49 Appellants argue that CNA had a duty to defend Regal and, because CNA refused to defend Regal or contribute to the *Bootz* settlement, CNA committed an act of bad faith. It does not necessarily follow, though, that simply because CNA refused to defend Regal as a primary carrier, CNA acted in bad faith.

¶ 50 In response to the tender of defense in this case, CNA pointed to the excess coverage language in its additional insured endorsement and advised Regal that CNA's coverage was excess over the Auto–Owners and Zurich coverages that had not been exhausted. Appellants have not presented any facts demonstrating that Regal, Zurich, or Auto–Owners (or anyone else) claimed—*at that time*—that CNA was a primary insurer of Regal because the "other insurance" language in the additional insured endorsement irreconcilably conflicted with competing language in either the Zurich or Auto–Owners policies. Nor have Appellants directed our attention to any case from Arizona or elsewhere that had held, as of the time of the tender of defense, that an insurer claiming to be excess because of an additional insured endorsement must affirmatively discover and

compare its language with the "other insurance" clauses of the primary carriers before asserting its excess position. On this record, we conclude as a matter of law that CNA's decision to not participate as a primary carrier, even though ultimately incorrect, was reasonable. We also conclude as a matter of law that Appellants have not presented sufficient evidence to raise a triable issue of fact that CNA knowingly acted unreasonably. *See Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 237–38, ¶¶ 19–22, 995 P.2d 276, 279–80 (2000); *Noble*, 128 Ariz. at 190, 624 P.2d at 868; *Lopez v. Allstate Ins. Co.*, 282 F.Supp.2d 1095, 1100 (D.Ariz.2003). Therefore, summary judgment was properly granted to CNA on the bad faith claim.

¶ 51 Appellants also allege that they are entitled to punitive damages from CNA. Because summary judgment was properly granted on the bad faith claim, summary judgment was also appropriate on the accompanying punitive damages claim.

### 1994 Coverage Issue

¶ 52 On appeal Appellants have raised the issue whether CNA owed Regal primary coverage for alleged losses occurring in late 1994 because the initial CNA policy period began on October 1, 1994 and the Auto–Owners primary coverage did not begin until January 1, 1995. Some of the *Bootz* homeowners alleged that they sustained flooding damage in "late 1994." After examining the record, however, we conclude that Appellants have waived any claim that CNA provided applicable coverage for Regal during late 1994. "This court has not infrequently announced its adherence to what, with but few exceptions, is now an almost universal rule that the court will not on appeal consider for the first time a question not raised in the lower court, and which might have been heard and determined there." *J.H. Mulrein Plumbing Supply Co. v. Walsh*, 26 Ariz. 152, 161, 222 P. 1046, 1049 (1924) (citation omitted); *see also Allstate Indem. Co. v. Ridgely*, 214 Ariz. 440, 442, ¶ 7, 153 P.3d 1069, 1071 (App.2007) (stating that argument not raised below will not be considered on appeal). Appellants did not make this argument regarding CNA's 1994 coverage in response to CNA's motion for summary judgment. Furthermore, the available record is undeveloped regarding the existence and identity of Regal's direct primary CGL carrier for late 1994. Accordingly, we will not reach any potential issue regarding CNA's coverage for late 1994.

### CONCLUSION

¶ 53 We remand for further proceedings to determine whether Regal's alleged liability to the *Bootz* plaintiffs "arose out of" GMS's work for Regal.

¶ 54 If on remand Auto–Owners establishes that the alleged liability of Regal "arose out of" GMS's work, then the following additional determinations apply. As a matter of law no contract existed between GMS and Regal specifically requiring CNA's additional insured coverage for Regal to be primary. CNA's coverage for Regal is excess over the Auto–Owners coverage for 1995. Zurich's and CNA's policies contain conflicting "other insurance" language, with the result that Zurich and CNA were co-primary carriers of Regal during the years 1996 through 1998. Auto–Owners, Zurich, and CNA had duties to defend Regal in the *Bootz* litigation. A disputed issue exists as to whether and to what extent Auto–Owners paid more than its share of defense costs, and we remand for further factual and legal development of this issue. We affirm summary judgment in favor of CNA on all of Regal's claims and on any claim by Auto–Owners for reimbursement of any portion of its indemnity payment to help settle the *Bootz* litigation. We also affirm summary judgment on the bad faith and punitive damages claims.

¶ 55 CNA has requested an award of attorneys' fees on appeal as the prevailing party in a matter arising out of contract pursuant to A.R.S. § 12–341.01(A) (2003). We decline to award attorneys' fees on appeal at this time. We authorize the trial court to consider, in its discretion, an award for attorneys'

fees associated with this appeal, after the remanded issues have been determined.

¶56 The judgment of the trial court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

CONCURRING: DONN KESSLER, Presiding Judge and PATRICIA A. OROZCO, Judge.