NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

BAMFORD REALTY, INC, et al., *Plaintiffs/Appellants*,

*v.*

TOLL BROTHERS, INC, et al., *Defendants/Appellees*.

No. 1 CA-CV 19-0478
FILED 7-16-2020

---

Appeal from the Superior Court in Maricopa County
No. CV2016-016367
The Honorable Daniel G. Martin, Judge

**AFFIRMED**

---

COUNSEL

Keller Rohrback LLP, Phoenix
By Gary A. Gotto, Ron Kilgard, Jerald Bien-Willner
*Counsel for Plaintiffs/Appellants*

Cohen Dowd Quigley PC, Phoenix
By Daniel G. Dowd, Daniel E. Durchslag, Rebecca L. van Doren
*Counsel for Defendants/Appellees*

---

**MEMORANDUM DECISION**

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Kent E. Cattani joined.

---

**C A M P B E L L**, Judge:

¶1        Bamford Realty, Inc., dba Bamford Southwest, Inc., and Bamford Equity Corp. (collectively, "Bamford") appeals the superior court's order granting summary judgment to defendants, Toll Brothers, Inc., Toll Brothers AZ Construction Company, and Toll Brothers Affiliated Entities 1-5 (collectively, "TBI"). For the reasons stated below, we affirm the judgment.

**BACKGROUND**

¶2        Several years before the events in question, Bamford and Morrison Enterprises, Inc. ("Morrison") jointly owned and developed residential communities through an entity known as Whitewing. In dealing with Whitewing, Bamford acted primarily through its president, Greg Bamford. Mr. Bamford's adult sons, David and Adam, were minority owners of Bamford.

¶3        Whitewing's assets consisted of 101 finished lots in the Germann Estates subdivision, seven finished homes in Germann Estates, two unfinished subdivisions known as San Tan Magma and Encanto Tierra, and two lots in other Whitewing neighborhoods. In early 2015 Morrison's founder passed away. New Morrison management sought to terminate its interest in Whitewing. To that end, Morrison and Bamford reached a settlement agreement providing that Morrison would receive Whitewing's assets in exchange for releasing Bamford's significant financial obligations to Whitewing. Bamford received an option to purchase Encanto Tierra and San Tan Magma for $8.7 million and agreed to "assist and consult" with the sale of Whitewing for six months in return for $5,000 per month from Morrison. The settlement agreement had a delayed closing to allow Bamford to locate an investor to buy and continue developing the Whitewing properties.

¶4        Through a mutual acquaintance, Mr. Bamford and TBI executives, Robert Flaherty and Jeff Nielsen, met in November 2015 to

discuss TBI acquiring and developing the Whitewing properties. Based on his history with Morrison, Mr. Bamford believed Morrison would be interested in selling the Whitewing assets as a package for $30 million. According to Mr. Bamford, at this initial one-hour meeting, Bamford and TBI agreed to jointly acquire and develop the Whitewing properties, with TBI funding the $30 million purchase in exchange for Bamford assisting with the deal and foregoing its option to buy San Tan Magma and Encanto Tierra. Mr. Bamford contends that the parties agreed to split the proceeds after TBI recouped its investment, but later agreed that Bamford would receive the seven finished homes as its share of the profits. At this time, Mr. Flaherty believed Bamford held an ownership interest of about $7 million in the Whitewing assets and wanted to replace its capital partner Morrison or get paid out for its interest.

¶5        Bamford prepared and sent TBI a draft letter of intent ("LOI") regarding its role in the purchase of Whitewing assets from Morrison. TBI responded with a modified LOI, which Bamford then forwarded to Morrison on behalf of TBI. When TBI first met with representatives from Morrison in December 2015, it learned that Bamford did not have any equity or ownership interest in the Whitewing assets. From that point, TBI negotiated directly with Morrison, at Morrison's insistence,[1] and did not respond to Bamford's inquiries into the status of the TBI-Morrison sale. Morrison accepted the offer of $30 million. When Bamford expressed concern that its interests might not be protected because TBI was negotiating directly with Morrison, Bamford claims Mr. Flaherty stated TBI would honor the agreement. During this same period, Bamford marketed its option to other investors.

¶6        After TBI and Morrison reached an agreement regarding the sale of the Whitewing assets, Bamford notified Morrison that it would not exercise its option on the San Tan and Encanto Tierra properties. During TBI's due diligence period, Bamford communicated with TBI on various issues relating to the Whitewing properties, Germann Estates homeowner's association, and the Town of Gilbert. The parties dispute whether Bamford provided this assistance as part of the alleged Bamford-TBI agreement or because he was obligated to assist in the sale of Whitewing assets pursuant to the Bamford-Morrison settlement agreement. The TBI-Morrison sale closed in July 2016.

---

[1] Morrison representatives denied imposing this condition, but it is not relevant for resolving the issues on appeal.

**¶7** Thereafter, Bamford met with Messrs. Flaherty and Nielsen to discuss Bamford's contention that TBI reneged on their agreement. TBI informed Bamford that the initial talks of reaching an agreement were based on the incorrect impression, allegedly given by Bamford, that Bamford had an ownership interest in the Whitewing assets. Bamford then sued TBI for breach of contract, breach of fiduciary duty, unjust enrichment, and detrimental reliance, seeking a constructive trust, among other remedies.

**¶8** The superior court granted summary judgment in favor of TBI because Bamford failed to present sufficient evidence of a contract, partnership, or joint venture. Specifically, the court found any agreement lacked specificity and consideration. Alternatively, the court found the statute of frauds barred the alleged contract. Finally, the court found insufficient evidence to support Bamford's claims for unjust enrichment and detrimental reliance. The court awarded TBI $238,760 in attorneys' fees. Bamford timely appealed.

## DISCUSSION

**¶9** Summary judgment is appropriate "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme School v. Reeves,* 166 Ariz. 301, 309 (1990). We review the superior court's decision to grant summary judgment de novo, considering the facts and any inferences drawn from those facts in the light most favorable to the party opposing the motion. *Tierra Ranchos Homeowners Ass'n v. Kitchukov,* 216 Ariz. 195, 199, ¶ 15 (App. 2007).

**I.  The Evidence Did Not Establish the Existence of an Enforceable Agreement.**

**¶10** An enforceable contract requires "'an offer, an acceptance, consideration, and *sufficient specification of terms so that the obligations involved can be ascertained.*'" *Regal Homes, Inc. v. CNA Ins.,* 217 Ariz. 159, 166, ¶ 29 (App. 2007) (quoting *Savoca Masonry Co. v. Homes & Son Const. Co.,* 112 Ariz. 392, 394 (1975) (emphasis added in *Regal Homes*)). Whether the terms of the alleged agreement are reasonably certain "is important as a factor in determining whether the parties intended to make a binding offer and acceptance." *Schade v. Diethrich,* 158 Ariz. 1, 9 (1988).

**¶11** The superior court found insufficient evidence regarding the specific terms of an agreement between Bamford and TBI. Bamford

contends summary judgment was improper because the evidence showed Bamford and TBI agreed to jointly pursue the purchase and development of the Whitewing properties for $30 million, to be paid by TBI. In exchange, Bamford would assist in the deal, forego its option, and receive seven finished homes as its share of the profits. According to TBI, at the initial meeting, it expressed interest in potentially working with Bamford to purchase the Whitewing assets in which TBI mistakenly believed Bamford had an ownership interest.

¶12        There was no written agreement after the initial meeting. Bamford relies on Mr. Bamford's deposition testimony and declaration to support its claim that the parties entered into an enforceable agreement. Bamford also cites the draft LOI which referred to the creation of a "new entity" between Bamford and TBI after TBI and Morrison reached an agreement for the purchase of the Whitewing.

¶13        After receiving the draft LOI prepared by Bamford, Mr. Flaherty thanked Mr. Bamford for "entertaining this partnership" and expressed hope that they could "put something together that benefits all parties." He stated that Mr. Nielsen was working on the deal and hoped to have an offer to Mr. Bamford the next day. TBI never produced an offer relating to a Bamford-TBI agreement or partnership. Instead, TBI submitted a modified LOI regarding the purchase of Whitewing assets from Morrison. TBI's LOI omitted any reference to a Bamford-TBI entity and stated only that TBI and Bamford came to a "preliminary agreement" regarding Bamford's option. According to Mr. Nielsen, this was because they had not discussed whether Bamford would become part of the TBI entity. Bamford sent the modified LOI to Morrison and, therefore, was aware of TBI's position—the parties had not reached an agreement.

¶14        Bamford also contends the deposition testimony of Mr. Flaherty and Mr. Nielsen shows an intent to enter into an agreement. According to Mr. Flaherty, the parties discussed the "opportunity to do a venture" to purchase assets it believed Bamford owned and "the next step" if TBI was interested. He believed they had a deal that Bamford would retain some of the San Tan lots, which was later changed to seven finished homes with an equivalent value. Mr. Nielsen testified, consistently, that they discussed two possible compensation options with Bamford, but they had not discussed whether Bamford would become part of the TBI entity.

¶15        The fact that one or more terms in an alleged agreement are unspecified may show that a party does not intend to agree, but a party's actions "may show conclusively that they have intended to conclude a

binding agreement, even though one or more terms are missing or are left to be agreed upon." Restatement (Second) of Contracts ("Restatement") § 33, cmt. a (1981). Bamford contends TBI's actions show it agreed that Bamford would receive seven homes as part of the Bamford-TBI agreement. For example, TBI's proforma did not include proceeds for the seven homes in its calculations. Similarly, Mr. Flaherty's December 2015 email to Mr. Nielsen and the TBI legal department did not mention the seven homes when describing what TBI would acquire in the Whitewing deal.

¶16        Bamford contends this evidence creates a question of fact regarding the existence of an agreement. However, there is also significant evidence *from Bamford* that the parties did not reach an enforceable agreement after the initial meeting. For example, a month after the meeting in an email from Bamford's attorney to Morrison's attorney:

> Bamford understands this business context and *was willing to wait and see what TB had in mind until later in the process*, so that you would have a clear path to negotiate your best deal with TB. As I said in our phone conversation last week, in my view deferring this issue is more a risk for Bamford than for your clients, but he was willing to take that risk in order to facilitate the process.
>
> However, at your request, Bamford is happy to try to accelerate that step, so that your client can have assurance that the relationship between Bamford and TB, or lack thereof, will not upset the deal that you negotiate with TB. In that spirit, he spoke with TB again last week and asked them to try to arrive at a concrete understanding with him as soon as possible. However, Bamford did not present any specific demands or proposals. *The talks to date have simply involved ideas for incentivizing Bamford's continuing participation after TB acquires the assets, such as brokerage and participation in profits from future development, and Greg has now asked TB to present a focused proposal to him ASAP.* (Emphasis added).

¶17        Even before this email, in a November 2015 letter to Morrison, Bamford stated that "during the due diligence period, Bamford will be working with [TBI] in developing a plan which will include the option Bamford holds on Whitewing IV, LLC." In addition, Mr. Bamford emailed his sons in December 2015, stating that the closing of the Morrison-Bamford settlement agreement, "leads to the alternative of Bamford forming our deal to go forward directly with [TBI.]"

¶18         As late as March 2016, Bamford's attorney asked TBI to let Bamford know if TBI does not want to proceed so he can "work with other parties . . . ." In a May 2016 email to his attorney, Mr. Bamford described his interactions with TBI's "due diligence team" and stated that he would like to help but "wanted an up-date on how [TBI] is currently viewing the eventual involvement of Bamford on a portion of the [Whitewing] assets as was discussed when I presented them the opportunity in October. Bamford also continued to market its option to other potential buyers during this time.

¶19         All of these communications *by Bamford* establish that Bamford and TBI had not finalized an agreement in the initial meeting, as Bamford now claims. We must consider Bamford's claim in the context in which it arose; that is, parties who had never met or done business together orally agreed to a complex $30 million real estate transaction in a one-hour meeting with no contemporaneous writing.[2] *See* Restatement § 26 cmt. a ("If the addressee of a proposal has reason to know that no offer is intended, there is no offer even though he understands it to be an offer. *'Reason to know' depends not only on the words or other conduct, but also on the circumstances, including previous communications of the parties. . . .*" (Emphasis added.) Bamford and TBI lacked any previous course of dealing upon which a reasonable person could conclude they had reached an enforceable "agreement to agree." For this reason, this case is distinguishable from *AROK Const. Co. v. Indian Const. Servs.*, 174 Ariz. 291, 293-94, 298 (App. 1993) (holding terms of a contract were sufficiently certain, in part, because the parties had a previous "course of dealing involving a standard form contract which could be used to supply any missing terms.").

¶20         The evidence Bamford cites does not create a question of fact sufficient to preclude summary judgment in light of the overwhelming evidence, including Bamford's statements and conduct showing the parties had not entered into an enforceable contract. No reasonable juror could conclude that the initial meeting resulted in an enforceable contract. *See Orme School,* 166 Ariz. at 309 (summary judgment is appropriate when the facts produced by the nonmoving party "have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent."). At most, Bamford

---

[2] The alleged oral agreement did not specify corporate form, name of the relevant terms such as future capital calls, percentage ownership of the partnership, voting shares, or funding future costs of development, among other things.

presented evidence of a preliminary agreement to reach an agreement in the future, the terms of which were broadly discussed, but never finalized. We affirm the superior court's ruling that Bamford did not present sufficient evidence that the parties agreed to specific terms, and, therefore, no enforceable agreement existed. Accordingly, we need not address the alternative grounds on which the court ruled in favor of TBI.

## II.   The Lack of an Enforceable Agreement Precludes Finding a Joint Venture

**¶21**          "A joint venture is formed when two or more parties agree to pursue a particular enterprise in the hope of sharing a profit." *Ellingson v. Sloan,* 22 Ariz. App. 383, 386 (App. 1974). The five elements required for a joint venture are (1) a contract, (2) a common purpose, (3) a community of interest, (4) an equal right of control, and (5) participation in profits and losses. *Id.* The superior court found Bamford failed to produce sufficient evidence of a contract, equal rights of control, and participation in profits and losses.

**¶22**          As discussed above, there was insufficient evidence as to the existence of a contract, one of the necessary elements to establish a joint venture. *See id.* Therefore, the superior court properly granted summary judgment on Bamford's claim that the parties entered into a joint venture.

## III.   The Evidence Does Not Support an Unjust Enrichment Claim

**¶23**          To establish an unjust enrichment claim, Bamford must show (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of any remedy at law. *See Freeman v. Sorchych,* 226 Ariz. 242, 251, ¶ 27 (App. 2011). Bamford contends he was impoverished by foregoing the option and by the time and effort spent assisting TBI with the sale. Bamford argues TBI was enriched by the lucrative Whitewing transaction, which Bamford contends would not have transpired without its actions in reliance on the agreement with TBI.

**¶24**          Relief under the theory of unjust enrichment is available only when it would be inequitable or unjust for the defendant to retain the benefit without compensating the plaintiff. *See Murdock-Bryant Constr., Inc. v. Pearson,* 146 Ariz. 48, 54 (1985). Bamford argues that TBI unjustly cut it out of the Whitewing deal. However, as discussed above, no agreement obligated TBI to compensate Bamford for foregoing its option or assisting on the transaction. Thus, Bamford did not reasonably rely on these alleged

oral assurances. Moreover, it is undisputed that Bamford continued to market its option to other investors, which further indicates Bamford did not believe there was a binding agreement with TBI. Thus, its decision to let the option lapse without a binding agreement from TBI does not mean that TBI caused the alleged impoverishment. The superior court properly granted judgment in favor of TBI on the unjust enrichment claim.

## IV. The Evidence Does Not Support a Detrimental Reliance Claim.

¶25 The basis for Bamford's detrimental reliance claim is that it relied on TBI's assurance that it would not exclude Bamford, even though TBI was negotiating directly with Morrison. This claim fails for the same reason as the unjust enrichment claim—Bamford was not justified in relying on a nonexistent agreement.

## CONCLUSION

¶26 We affirm the judgment in favor of TBI. In the exercise of our discretion, we award TBI its reasonable attorneys' fees and costs on appeal upon compliance with ARCAP 21. *See* A.R.S. §§ 12-341.01, 12-342; *ML Servicing Co. v. Coles,* 235 Ariz. 562, 570, ¶ 30 (App. 2014) (for purposes of § 12-341.01, a claim "arises out of contract" when the defendant successfully proves no contract exists).



AMY M. WOOD • Clerk of the Court
FILED: AA