269 P.3d 678

The BEST CHOICE FUND, LLC, a Florida limited liability company; National Transportation Holding Corporation, an Arizona corporation, Plaintiff/Appellant/Cross–Appellee,

v.

LOW & CHILDERS, P.C., an Arizona professional corporation, Defendant/Appellee/ Cross–Appellant,

and

USA Risk Group (West), Inc., a foreign corporation, Defendant/Appellee.

No. 1 CA–CV 10–0860.

Court of Appeals of Arizona, Division 1, Department A.

Dec. 20, 2011.

As Amended Jan. 6, 2012.

Jaburg & Wilk PC By Roger L. Cohen, Kathi M. Sandweiss, Phoenix, Attorneys for Plaintiffs/Appellants–Cross Appellees.

Jones Skelton & Hochuli, PLC By Donald L. Myles, Jr., Lori L. Voepel and Nicholas D. Acedo, Phoenix, Attorneys for Defendant/Appellee–Cross Appellant.

Christian Dichter & Sluga PC By Douglas L. Christian, Gena L. Sluga, Alison Rebecca Christian, Phoenix, Attorneys for Defendant/Appellee USA Risk Group (West).

## OPINION

TIMMER, Presiding Judge.

¶ 1 This appeal from the entry of summary judgment against appellants National Transportation Holding Corporation and Best Choice Fund, LLC requires us to consider a myriad of issues relating to the accrual of a legal malpractice claim and the authority of an agent to bind its principal to a release of claims. After doing so, we affirm the trial court's entry of summary judgment in favor of Low & Childers, P.C. but reverse summary judgment in favor of USA Risk Group, Inc. and remand for additional proceedings.

## BACKGROUND

¶ 2 National Transportation Holding Corporation ("NT")[1] is an Arizona mutual risk insurance company and captive insurer[2] formed in 2005 to provide liability insurance to taxi companies, limousine services, and livery service providers. NT retained Low & Childers, P.C. ("L & C") to provide legal services in connection with the formation, licensing, and regulatory compliance of the company. L & C prepared and filed a license application with the Arizona Department of Insurance ("DOI") on June 1, 2005. Around the same time, NT deposited $1.5 million into its capital account as required to meet DOI's capitalization requirements. *See* A.R.S. § 20–1098.03(A) (providing director of DOI shall not issue a license to a captive insurer "unless the insurer possesses and thereafter maintains minimum unimpaired paid-in capital and surplus in combination").

¶ 3 Arizona law requires a captive insurer to employ a "captive manager" to "maintain the books and records of the captive insurer's business, transactions and affairs" and to "promptly notify the director of any failure of the captive insurer to comply with" the applicable laws. A.R.S. § 20–1098.16. NT retained USA Risk Group, Inc. ("USA") to fulfill this role.

¶ 4 On September 12, 2005, DOI issued NT a certificate authorizing it to begin conducting business. The certificate was accompanied by a "Conditions Addendum," which, among other things, required USA to be a signatory on all checks and to promptly notify DOI if NT's capital and surplus fell below $1.5 million.

¶ 5 Soon after issuance of the certificate, NT transferred all its capital funds into an investment fund. NT also issued checks without USA's signature. USA notified DOI of these events on February 3, 2006.

¶ 6 On February 10, DOI summarily suspended NT's certificate of authority for the reasons reported by USA. *See* A.R.S. § 20–1098.09 (authorizing director to "suspend, revoke or refuse to renew the license of a captive insurer" for listed reasons, including impairment of capital and surplus). The order immediately prohibited NT from issuing new and renewed insurance and required it to cancel or non-renew all insurance contracts by March 1. Additionally, DOI required NT to submit "an application for [NT's] withdrawal from the insurance business that includes detailed plans for the elim-

---

1. NT was known as "National Transportation Risk Retention Group" at the time of its formation. After filing its complaint, National Transportation Holding Corporation assigned its legally assignable rights and claims in this lawsuit to The Best Choice Fund, LLC. For ease of reference, we refer to all plaintiffs collectively as "NT."

2. "Captive insurers" insure the liabilities of their shareholders and the shareholders' affiliates. *Exec. Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.,* 681 F.Supp.2d 694, 702 n.11 (S.D.W.Va.2009). Captive insurers are governed by Arizona Revised Statutes ("A.R.S.") sections 20–1098 to –1098.23 (2010 & Supp. 2010), and must be licensed by the director of the Arizona Department of Insurance. A.R.S. § 20–1098.01(A); A.R.S. § 20–102 (2010).

ination of all [NT] liabilities." On February 20, NT submitted to DOI an amended business plan detailing procedures for withdrawal and dissolution. NT did not appeal the suspension order. *See* A.R.S. § 41–1092.03(B) (Supp.2010) (authorizing appeal of agency action within 30 days of receipt of notice of agency action).

¶ 7 On March 20, NT's president, Roy Gill, and USA's vice president, Marc Lapointe, executed a settlement agreement and mutual release of claims, which purported to terminate the relationship between the parties and release both NT and USA from all claims arising from events occurring before March 20 (the "USA Release"). Ten days later, on March 30, NT, through Gill, and L & C, through partner S. David Childers, executed a settlement agreement and mutual release of claims releasing the parties from all claims arising from events occurring before March 30 (the "L & C Release"). L & C continued to represent NT for purposes of the "run-off" period of withdrawal and dissolution.

¶ 8 More than two years later, on June 6, 2008, the State issued NT a certificate of compliance for dissolution or withdrawal, indicating NT had complied with the relevant statutes required for dissolution of the company. Accordingly, on October 31, the Arizona Corporation Commission issued NT a certificate of dissolution.

¶ 9 On June 23, 2009, NT initiated this lawsuit. NT alleged L & C committed professional negligence and breach of contract. NT additionally alleged USA breached its captive management agreement. The trial court subsequently granted summary judgment for both L & C and USA on all claims, ruling in pertinent part that (1) NT's claims against L & C were barred by the statute of limitations, and (2) the claim against USA was barred by the doctrine of accord and satisfaction due to the USA Release. After the court denied NT's motion for reconsideration, judgment was entered in favor of both L & C and USA. This timely appeal and cross-appeal followed.

## STANDARD OF REVIEW

¶ 10 The trial court may grant summary judgment when "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Ariz. R. Civ. P. 56(c). In reviewing the grant of summary judgment, we determine de novo whether any genuine issues of material fact exist and whether the trial court properly applied the law. *Eller Media Co. v. City of Tucson*, 198 Ariz. 127, 130, ¶ 4, 7 P.3d 136, 139 (App.2000). We view the facts and the inferences to be drawn from those facts in the light most favorable to the party against whom judgment was entered. *Prince v. City of Apache Junction*, 185 Ariz. 43, 45, 912 P.2d 47, 49 (App.1996). We will affirm the trial court's decision if correct for any reason. *City of Phoenix v. Geyler*, 144 Ariz. 323, 330, 697 P.2d 1073, 1080 (1985).

## DISCUSSION

### I. Claims Against L & C

### A. Legal malpractice

¶ 11 In Arizona, a lawsuit alleging legal malpractice must be filed within two years of the date the cause of action accrues. A.R.S. § 12–542; *Keonjian v. Olcott*, 216 Ariz. 563, 565, ¶ 9, 169 P.3d 927, 929 (App.2007). The trial court ruled that NT's claim for legal malpractice against L & C accrued in February 2006 when DOI suspended NT's certificate of authority. Thus, the court entered judgment for L & C because NT filed its lawsuit in June 2009—more than one year after the statute of limitations expired in February 2008. NT contends the trial court erred because a question of fact exists regarding the date NT's claim accrued. According to NT, the evidence supports a finding that its claim accrued in June 2008 when DOI issued the certificate of compliance for dissolution and withdrawal. Because NT filed its complaint within two years of that time, it asserts summary judgment is improper. Alternatively, NT argues the limitations period is tolled and, regardless, because some acts of malpractice occurred within two years of the initiation of this lawsuit, a claim stemming from these acts remain viable. We address each contention in turn.

*Accrual date*

¶ 12 A legal malpractice claim accrues when "(1) the plaintiff knows or reasonably should know of the attorney's negligent conduct; and (2) the plaintiff's damages are ascertainable, and not speculative or contingent." *Glaze v. Larsen,* 207 Ariz. 26, 29, ¶ 13, 83 P.3d 26, 29 (2004) (quoting *Kiley v. Jennings, Strouss & Salmon,* 187 Ariz. 136, 139, 927 P.2d 796, 799 (App.1996)). NT does not contest it was aware of L & C's alleged malpractice at the time DOI suspended NT's certificate of authority in February 2006. Rather, NT argues that because its certificate was merely suspended, NT's damages were not ascertainable at that time because a chance existed DOI would reinstate NT's certificate.

¶ 13 NT relies primarily on *Amfac Distribution Corporation v. Miller (Amfac I),* 138 Ariz. 155, 673 P.2d 795 (App.1983), *approved as supplemented,* 138 Ariz. 152, 673 P.2d 792 (1983) (*Amfac II*), to support its position. Those cases held that damages based on an attorney's acts and omissions in the course of litigation become ascertainable and non-speculative at the time the appellate process is either waived or completed. *Amfac II,* 138 Ariz. at 153–54, 673 P.2d at 793–94. At that time, damages are "irremedial" or "irrevocable" because no opportunity exists to eliminate them through a successful appeal. *Amfac I,* 138 Ariz. at 156–58, 673 P.2d at 796–98; *Amfac II,* 138 Ariz. at 154 & n.2, 673 P.2d at 794 & n.2. According to NT, its damages were not "irrevocable" until June 2008, at the earliest, because until that time, it did not know how DOI would resolve the suspension.

¶ 14 We agree with L & C and the trial court that the rationale of *Amfac I* and *Amfac II* does not defer the accrual date for NT's legal malpractice claim until June 2008. As our supreme court has recognized, the holdings in the *Amfac* cases were limited to malpractice claims based on acts or omissions that occurred in the context of litigation:

> In contrast [to litigation], when a legal malpractice action arises in a non-litigation context, the cause of action accrues when the plaintiff knew or should have known that its attorneys had provided negligent legal advice, and that the attorneys' negligence was the direct cause of harm to the plaintiff, notwithstanding that the plaintiff's damages may not have been fully ascertainable at that time. This is because the harm is "irremedial" or "irrevocable" at that point and will not be avoided by a future appeal or other court proceedings.

*Glaze,* 207 Ariz. at 30 n. 1, ¶ 15, 83 P.3d at 30 n. 1 (citations omitted); *see also Commercial Union Ins. Co. v. Lewis & Roca,* 183 Ariz. 250, 256, 902 P.2d 1354, 1360 (App.1995) ("It is only in the context of litigation, however, that accrual of the cause of action is deferred until the litigation in which the malpractice arose is finally resolved." (citations omitted)); *Ariz. Mgmt. Corp. v. Kallof,* 142 Ariz. 64, 68, 688 P.2d 710, 714 (App.1984) ("*AMFAC* was expressly limited to situations where *malpractice occurs during the course of litigation.*").

¶ 15 The alleged malpractice in this case arose from acts or omissions that occurred outside litigation. The hallmark of "litigation" is an adversary proceeding, which is characterized by the existence of opposing parties and contested issues. *Cannon v. Hirsch Law Office, P.C.,* 222 Ariz. 171, 177, ¶ 20, 213 P.3d 320, 326 (App.2009). At the time L & C committed alleged acts of negligence that resulted in the suspension order, NT was not engaged in any adversarial proceeding. Additionally, NT did not appeal its suspension, as it was entitled to do. A.R.S. § 41–1092.03(B). Instead, NT acquiesced in the order by filing its amended business plan for withdrawal and dissolution, and it proceeded to wind up its insurance business in Arizona. No prospect existed that the damages suffered by NT would "vanish with successful prosecution of an appeal and [result in an] ultimate vindication of the attorney's conduct." *Amfac I,* 138 Ariz. at 156, 673 P.2d at 796. Because NT's legal malpractice claim did not arise from acts or omissions committed during litigation, the "continuing litigation" rationale of the *Amfac* cases is inapplicable.

¶ 16 In a related argument, NT asserts its damages were not ascertainable at the time of the February 2006 suspension because it had no way of knowing then whether DOI would reinstate the certificate of authority.

**508**

We disagree. NT's harm became ascertainable upon issuance of the suspension order because it carried direct, harmful consequences: DOI ordered NT to immediately cease issuing new insurance and begin the process of cancelling existing insurance. The possibility DOI would reverse its position, even though NT failed to appeal and acquiesced in the order by filing an amended business plan, does not alter the fact that NT suffered discernable harm at the time of the suspension order. *Glaze,* 207 Ariz. at 30 n. 1, ¶ 15, 83 P.3d at 30 n. 1 (stating legal malpractice claim accrues "notwithstanding that the plaintiff's damages may not have been fully ascertainable at that time"); *Commercial Union,* 183 Ariz. at 255, 902 P.2d at 1359 (noting occurrence of harm and extent of damages are "two distinct concepts"). The clock started ticking on the legal malpractice claim even though NT's damages could have been eliminated or substantially minimized by future events. *See Envtl. Liners, Inc. v. Ryley, Carlock & Applewhite,* 187 Ariz. 379, 384–85, 930 P.2d 456, 461–62 (App.1996) (declining to hold that malpractice claim arising from recording of mining lien did not accrue until conclusion of separate bankruptcy proceeding that could affect potential damages).

*Tolling*

 ¶ 17 NT alternatively argues the statute of limitations does not bar it as a matter of law from pursuing its legal malpractice claim because evidence shows the limitations period was tolled by (1) L & C's concealment of its negligence, (2) economic duress, and (3) L & C's continuous representation of NT through the run-off of the busi-

ness. NT has waived the initial two issues by failing to raise them properly to the trial court.[3] *Regal Homes, Inc. v. CNA Ins.,* 217 Ariz. 159, 171, ¶ 52, 171 P.3d 610, 622 (App. 2007) (stating appellate court generally does not consider issues raised for the first time on appeal). We therefore turn to NT's remaining argument for tolling the statute of limitations.

 ¶ 18 The "continuous representation" doctrine provides that if a claim for legal malpractice accrues while the attorney continues to represent the client on the matter giving rise to the malpractice, the statute of limitations begins to run when the attorney's representation concerning the matter is completed. *Shumsky v. Eisenstein,* 96 N.Y.2d 164, 726 N.Y.S.2d 365, 750 N.E.2d 67, 70–71 (2001); George L. Blum, Annotation, *Attorney Malpractice Tolling or Other Exceptions to Running of Statute of Limitations,* 87 A.L.R.5th 473 (2001) (citing *R.D.H. Commc'ns, Ltd. v. Winston,* 700 A.2d 766 (D.C.1997)). The rationale underlying the doctrine is that a client should not be expected to jeopardize the attorney-client relationship by assessing and questioning the attorney's abilities until the matter is completed. *Shumsky,* 726 N.Y.S.2d 365, 750 N.E.2d at 70.

¶ 19 Arizona courts have not squarely addressed the applicability of the continuous representation doctrine. *Cf. Amfac I,* 138 Ariz. at 157–58, 673 P.2d at 797–98 (stating rationale of continuous representation doctrine adopted outside Arizona supports holding that malpractice claim arising from litigation does not accrue until completion of litigation). And courts outside Arizona that

---

3. We reject NT's contention it sufficiently raised the issues because they were "implicit" in affidavits provided in response to L & C's motion for summary judgment. The trial court cannot be expected to glean a party's arguments from a review of the evidence; the party must articulate its legal arguments. *See Cont'l Lighting & Contracting, Inc. v. Premier Grading & Utils., LLC,* 227 Ariz. 382, 386, ¶ 12, 258 P.3d 200, 204 (App.2011) (noting legal theories must be timely raised to the trial court to afford it an opportunity to address all issues); *see also Ramirez v. Health Partners of S. Ariz.,* 193 Ariz. 325, 326 n. 2, 972 P.2d 658, 659 n. 2 (App.1998) ("Judges are not like pigs, hunting for truffles buried in [the record]." (alteration in original)) (quoting

*United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991)).

NT arguably raised economic duress in its motion for reconsideration, which the court denied without requiring a response. Generally, a party cannot preserve an issue for appeal by raising it for the first time in a motion for reconsideration if the opposing party is deprived of an opportunity to respond with applicable evidence and arguments. *Evans Withycombe, Inc. v. W. Innovations, Inc.,* 215 Ariz. 237, 240, ¶ 15, 159 P.3d 547, 550 (App.2006). That is the situation here, and NT therefore failed to preserve the economic duress issue by raising it in the motion for reconsideration.

have considered the doctrine are divided on its applicability.[4] NT urges us to adopt the continuous representation doctrine and reverse the summary judgment because L & C continuously represented NT through June 2008—a date less than two years before initiation of this lawsuit. L & C variously counters that the doctrine is inconsistent with the discovery rule, this court lacks authority to adopt the doctrine, and, in any event, application of the doctrine should not result in reversal of the summary judgment.

¶ 20 L & C's final contention is dispositive. Even assuming applicability of the continuous representation doctrine, the trial court appropriately entered summary judgment in favor of L & C. NT's first amended complaint alleges L & C "had a duty to comply with the applicable standard of care with respect to the application and licensing process" and breached that duty in enumer-

ated ways. NT also alleged L & C's acts of malpractice breached the terms of a February 2005 retention agreement executed by the parties, which required L & C to provide legal services with respect to the formation of NT and its ongoing regulatory compliance. That agreement terminated in March 2006, as stated in the L & C Release.[5] The parties executed an agreement later in March 2006 for L & C to perform legal services in the run-off of NT. NT does not allege in its first amended complaint any malpractice based on acts taken during the run-off period. Thus, because L & C's legal representation regarding the matters giving rise to the malpractice claim ceased by at least March 2006, and NT does not allege any malpractice stemming from acts taken thereafter during the run-off period, the limitations period was tolled until March 2006 under the continuous representation doctrine. Because that date is more

---

4. The following cases illustrate jurisdictions that have adopted the doctrine or a modified form of the doctrine: *DeLeo v. Nusbaum*, 263 Conn. 588, 821 A.2d 744, 748–50 (2003); *Bleck v. Power*, 955 A.2d 712, 715 (D.C.2008); *Biomet, Inc. v. Barnes & Thornburg*, 791 N.E.2d 760, 765–67 (Ind.Ct. App.2003); *Morrison v. Watkins*, 20 Kan.App.2d 411, 889 P.2d 140, 146 (1995); *Alagia, Day, Trautwein & Smith v. Broadbent*, 882 S.W.2d 121, 125 (Ky.1994); *Lyons v. Nutt*, 436 Mass. 244, 763 N.E.2d 1065, 1070 (2002); *Bellino v. McGrath North Mullin & Kratz, PC LLO*, 274 Neb. 130, 738 N.W.2d 434, 444–45 (2007); *Greene v. Greene*, 56 N.Y.2d 86, 451 N.Y.S.2d 46, 436 N.E.2d 496, 500 (1982); *Riemers v. Omdahl*, 687 N.W.2d 445, 451–52 (N.D.2004); *Omni–Food & Fashion, Inc. v. Smith*, 38 Ohio St.3d 385, 528 N.E.2d 941, 944 (1988); *Williams v. Maulis*, 672 N.W.2d 702, 705 (S.D.2003); *Shipman v. Kruck*, 267 Va. 495, 593 S.E.2d 319, 324 (2004); *Janicki Logging & Constr. Co. v. Schwabe, Williamson & Wyatt, P.C.*, 109 Wash. App. 655, 37 P.3d 309, 313–15 (2001); *Dunn v. Rockwell*, 225 W.Va. 43, 689 S.E.2d 255, 271–72 (2009); *see also Wettanen v. Cowper*, 749 P.2d 362, 365 (Alaska 1988) (generally approving of but declining to adopt continuous representation doctrine); *Nevin v. Union Trust Co.*, 726 A.2d 694, 700–01 (Me.1999) (same).

The following cases have either rejected the doctrine or refused to adopt it: *Ragar v. Brown*, 332 Ark. 214, 964 S.W.2d 372, 376–77 (1998); *Broker House Int'l, Ltd. v. Bendelow*, 952 P.2d 860, 864 (Colo.Ct.App.1998); *Larson & Larson, P.A. v. TSE Indus., Inc.*, 22 So.3d 36, 44–46 (Fla.2009); *Hunter, Maclean, Exley & Dunn, P.C. v. Frame*, 269 Ga. 844, 507 S.E.2d 411, 415 (1998); *Blair v. Ing*, 95 Hawai'i 247, 21 P.3d 452, 469 n. 14 (2001); *Witt v. Jones & Jones Law*

*Offices, P.C*, 269 Ill.App.3d 540, 206 Ill.Dec. 891, 646 N.E.2d 23, 25–26 (1995); *Reeder v. North*, 701 So.2d 1291, 1297–98 (La.1997); *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 756 A.2d 963, 971–72, 974–78 (2000); *Channel v. Loyacono*, 954 So.2d 415, 420–21 (Miss.2007); *Zero Mfg. Co. v. Husch*, 743 S.W.2d 439, 441–42 (Mo.Ct.App.1987); *Schneider v. Leaphart*, 228 Mont. 483, 743 P.2d 613, 616–17 (1987); *Beane v. Dana S. Beane & Co., P.C*, 160 N.H. 708, 7 A.3d 1284, 1290–91 (2010); *Sharts v. Natelson*, 118 N.M. 721, 885 P.2d 642, 647–48 (1994); *St. Paul Fire & Marine Ins. Co. v. Speerstra*, 63 Or.App. 533, 666 P.2d 255, 259 n. 7 (1983); *Glenbrook Leasing Co. v. Beausang*, 839 A.2d 437, 441–42 (Pa.Super.Ct.2003); *Epstein v. Brown*, 363 S.C. 372, 610 S.E.2d 816, 818–20 (2005); *Cherry v. Williams*, 36 S.W.3d 78, 87 (Tenn.Ct. App.2000); *Boehm v. Wheeler*, 65 Wis.2d 668, 223 N.W.2d 536, 542–43 (1974), *overruled on other grounds as recognized by Hennekens v. Hoerl*, 160 Wis.2d 144, 465 N.W.2d 812, 823 & n. 1 (1991) (Abrahamson, J., dissenting); *Connell v. Barrett*, 949 P.2d 871, 874 (Wyo.1997).

At least two states, California and Michigan, have passed laws adopting the doctrine. *See Lockton v. O'Rourke*, 184 Cal.App.4th 1051, 109 Cal.Rptr.3d 392, 400 (2010) (Cal.Civ.Proc.Code § 340.6(a)(2) (West 2010)); *Maddox v. Burlingame*, 205 Mich.App. 446, 517 N.W.2d 816, 818 (1994) (Mich. Comp. Laws Ann. § 600.5838(1) (West 2011)).

5. The parties also executed a retention agreement in September 2005 concerning legal services for "general regulatory matters as they may arise from time to time." The settlement agreement stated that this agreement, like the one executed in February 2005, had terminated.

than two years before initiation of this lawsuit, application of the doctrine does not affect the propriety of the summary judgment, and we need not address the viability of the doctrine in Arizona.

*Acts within two years of lawsuit*

 ¶ 21 NT finally argues L & C engaged in separate acts of malpractice after issuance of the certificate of suspension, thereby resulting in new accrual dates beyond February 2006. In particular, NT alleges that after the suspension L & C committed malpractice by (1) entering into the L & C Release without complying with ethical requirements, and (2) continuing to represent NT during the run-off period while having "gross conflicts of interest." NT waived these issues by failing to raise them to the trial court in responding to the motion for summary judgment. *Regal Homes*, 217 Ariz. at 171, ¶ 52, 171 P.3d at 622. Regardless, NT fails to explain either how its lawsuit filed more than two years after execution of the L & C Release was timely or what acts during the run-off period constituted legal malpractice. As previously noted, *see supra* ¶ 20, the first amended complaint does not allege any acts of malpractice during the run-off period. The trial court did not err by failing to rule that some acts of alleged malpractice fell within the limitations period.

¶ 22 For the above-explained reasons, the trial court properly entered summary judgment for L & C on NT's legal malpractice claim.

**B. Breach of contract**

 ¶ 23 NT next argues the trial court erred by ruling as a matter of law that NT's breach-of-contract claim was subject to the two-year statute of limitations rather than the six-year period applicable to contract claims. *See* A.R.S. § 12–548 (2003). In its response to the motion for summary judgment, NT withdrew its contract claim "strictly contingent upon the Court agreeing that [NT] … has the right to pursue a legal malpractice claim against L[&]C." The court

did not agree the malpractice claim was viable, and the withdrawal was therefore nullified. NT nevertheless waived the issue it urges on appeal because it failed to raise it to the trial court. *Regal Homes*, 217 Ariz. at 171, ¶ 52, 171 P.3d at 622. We do not address it further.[6]

**II. Claim against USA**

 ¶ 24 NT argues the trial court erred by ruling as a matter of law that the execution and performance of the USA Release constituted an accord and satisfaction, thereby entitling USA to summary judgment on NT's breach-of-contract claim. The doctrine of accord and satisfaction discharges a contractual obligation or cause of action when the parties agree to exchange something of value in resolution of a claim or demand and then perform on that agreement, "the 'accord' being the agreement, and the 'satisfaction' its execution or performance." *Vance v. Hammer*, 105 Ariz. 317, 319, 464 P.2d 340, 342 (1970) (citation omitted). Like any contract, an accord must have (1) an appropriate subject for agreement, (2) parties competent to enter in the agreement, (3) consideration, and (4) a meeting of the minds between the parties. *Id.* at 320, 464 P.2d at 343. NT asserts a trier-of-fact could find that the USA Release was not a valid accord because it failed one or all the latter three elements, and, consequently, summary judgment is inappropriate.

**A. Competency of parties**

¶ 25 NT argues the evidence is disputed whether Roy Gill, NT's president, was authorized to enter in the USA Release. The trial court found that Gill possessed both actual authority and apparent authority to enter in the USA Release. We address each basis in turn.

*Actual authority*

 ¶ 26 A corporate entity necessarily acts through its agents, who, in turn, may only bind a principal within the scope of their

---

6. L & C filed a cross-appeal challenging the trial court's rejection of its accord-and-satisfaction argument as a basis for summary judgment. Be-

cause we affirm summary judgment for the reasons underlying the trial court's ruling, the cross-appeal is moot, and we do not address it.

authority, actual or apparent. *Lois Grunow Mem'l Clinic v. Davis,* 49 Ariz. 277, 284, 66 P.2d 238, 241 (1937). Actual authority includes both express authority outlined in specific language, and implied authority when the agent acts consistently with the agent's "reasonable interpretation of the principal's manifestation in light of the principal's objective and other facts known to the agent." *Ruesga v. Kindred Nursing Ctrs., L.L.C.,* 215 Ariz. 589, 597, ¶ 29, 161 P.3d 1253, 1261 (App.2007) (quoting Restatement (Third) of Agency § 2.01 cmt. b (2006)).

¶ 27 The trial court ruled as a matter of law that NT's amended bylaws provided Gill with actual authority to enter in the USA Release. The pertinent provisions provide as follows:

### Article III

#### Officers

. . . .

Section 5. *President: Powers and Duties.* The President shall, subject to the control of the Board of Directors, have general charge of the business of the corporation. He shall keep the Board of Directors fully informed, shall freely consult with them concerning the business of the corporation, and shall perform such other duties as may be assigned to him by the Board of Directors. He may sign, in the name of the corporation, all authorized contracts, documents, checks, and bonds, or other obligations.

. . . .

### Article IV

#### Contracts, Checks, Drafts, Bank Accounts, Etc.

Section 1. *Contracts.* Any contract or instrument necessary for the business of the corporation may be signed by the President or by any other officers thereunto authorized by the Board of Directors, and attested by the Secretary, who may affix thereto the seal of the corporation.

Reading these provisions together, the court ruled, "it is clear that the President had the authority to sign any contracts necessary for the business of the corporation without Board authority. Any other officer of the corporation could do so, but only upon the authorization of the Board of Directors." Because the suspension order did not preclude Gill from signing contracts, the court ruled that Gill had actual authority to enter in the USA Release.

¶ 28 We need not determine whether the trial court's interpretation of the bylaws is accurate as a matter of law. On the record before us, the trial court's application of this interpretation to the evidence does not support the entry of summary judgment. In compliance with Arizona law, article III, section 5 explicitly states that the president's general charge of the business is "subject to the control of the Board of Directors." *See* A.R.S. § 10–801(B) (2004) (providing corporate powers, business, and affairs must be exercised directly by board of directors or under board's authority). Thus, even assuming the bylaws authorized Gill to enter in contracts without explicit board authorization, Gill was not authorized to enter in contracts *contrary* to board direction. In response to USA's motion, NT relied on an affidavit from Lawrence Muirhead, NT's Chairman of the Board, who avowed that the USA Release was "completely unauthorized and contrary to the Board of Directors' intent and wishes." This testimony would permit a fact-finder to conclude that Gill lacked actual authority to enter in the USA Release because the board of directors opposed the act.

*Apparent authority*

¶ 29 An agent without actual authority can bind its principal to a contract, nevertheless, if the agent possesses apparent authority to enter in the contract. *Miller v. Mason–McDuffie Co. of S. Cal.,* 153 Ariz. 585, 589, 739 P.2d 806, 810 (1987). Apparent authority exists when the principal engages in intentional or inadvertent conduct that allows a third party reasonably to conclude that the agent has actual authority. *Id.; see also Reed v. Gershweir,* 160 Ariz. 203, 205, 772 P.2d 26, 28 (App.1989) ("Apparent or ostensible authority may be defined as that

authority which the principal knowingly or negligently holds his agent out as possessing, or permits him to assume, under such circumstances as to estop the principal from denying its existence."). When one deals with a known agent, however, "he must exercise due caution in ascertaining whether the agent is acting within the scope of his authority, if he wishes to bind the principal." *Lois Grunow Mem'l Clinic*, 49 Ariz. at 284, 66 P.2d at 242. The third party bears the burden of showing that its reliance on the agent's apparent authority was reasonable. *Miller*, 153 Ariz. at 590, 739 P.2d at 811.

¶ 30 NT asserts a dispute of fact exists regarding the reasonableness of USA's reliance on Gill's apparent authority to enter in the USA Release. USA takes the opposite position. Viewing the evidence presented in the summary judgment papers in the light most favorable to NT, as we must, we agree an issue of fact exists regarding the reasonableness of USA's reliance on Gill's apparent authority to bind NT to the USA Release.

¶ 31 NT retained Captive Insurance Managers of Phoenix ("CIMP") in August 2005 to serve as NT's captive manager. Gill had an ownership interest in CIMP along with his daughter and the spouse of a partner in L & C. Around this same time, NT retained Gill as its president. Consequently, CIMP could no longer fulfill the independent role required of a captive manager.

¶ 32 NT retained USA in September 2005 to serve as captive manager with CIMP providing "financial services." NT and USA entered in a "Captive Services Agreement" on September 1, 2005. Pursuant to the terms of the agreement, USA agreed to perform enumerated advisory and oversight tasks in exchange for an annual fee of $10,000. The agreement is signed by Leonard Steinberg, NT's secretary/treasurer, and Marc Lapointe, USA's vice president and manager.

¶ 33 According to NT, USA and CIMP secretly agreed that CIMP would perform the captive manager duties. Indeed, al-

though NT's certificate of authority required the captive manager to be a signatory on all NT checks, CIMP apparently handled that duty.

¶ 34 After USA assumed its captive management duties, Gill routinely communicated with USA and DOI about NT and participated in drafting documents related to the run-off. But although Gill identified himself in correspondence at times as president of NT, on other occasions he identified himself as associated with CIMP. For example, in February 2006, over a CIMP signature block, Gill sent USA a draft of the DOI–required amended business plan and stated he had participated in drafting the document. All correspondence sent by Gill to USA reflects that copies were sent to other NT representatives.

¶ 35 In January 2006, USA commenced confidential discussions with CIMP to purchase it. USA purchased CIMP months after USA and NT terminated their relationship.

¶ 36 When DOI suspended NT's certificate in February 2006, it required USA to assume a more active oversight role. To compensate USA for its increased duties, NT agreed to pay USA $10,000 per month and, according to USA, entered in a written endorsement to that effect.[7] Soon thereafter, however, USA resigned its position with DOI's permission.

¶ 37 Although USA had no dispute with NT and did not ask for a release of claims, Gill asked L & C to prepare the USA Release, which L & C then sent to USA for signature. Under the terms of the USA Release, NT agreed to pay USA $12,500; according to Lapointe, this amount was owed to USA under the terms of the Captive Management Agreement ($2,500) and endorsement ($10,000) for past work. Gill signed checks pre-dating the USA Release and paid these amounts to USA even though the amended business plan submitted to DOI the prior month stated that the NT board had passed a resolution authorizing only Lapointe

---

7. Although the endorsement in the record is unsigned, Lapointe testified at his deposition that the parties agreed to the endorsement, and the USA Release refers to it. Notably, although La-

pointe is the designated signatory for USA, the signature block for NT refers only to NT's "duly authorized representative."

to "sign all checks ... affecting any of [NT's] bank accounts." USA was aware of the terms of the amended business plan.

¶ 38 The above-described evidence supports a finding that USA's reliance on Gill's apparent authority was not reasonable. At the time L & C presented the USA Release to USA for signature, no reason arguably existed for NT to release claims against USA while NT was in the midst of running off its business, especially as no claims had been asserted, USA had not requested a release, and NT did not obtain much value in exchange for the release, *see infra* ¶ 42. Also, a fact-finder could conclude Gill was motivated to obtain NT's release of any claims against USA because any future assertion of a claim could jeopardize then-active negotiations for USA to purchase CIMP. In light of these unique circumstances, a fact-finder could decide that USA failed to exercise due caution in determining the scope of Gill's authority. *Lois Grunow Mem'l Clinic*, 49 Ariz. at 285, 66 P.2d at 242 ("The mere fact that one is dealing with an agent, whether the agency be general or special, should be a danger signal, [ ] like a railroad crossing suggests the duty to 'stop, look, and listen' .... Unusual and unnatural acts are not to be tolerated." (citation omitted)).

¶ 39 Additional circumstances surrounding execution of the USA Release arguably should have prompted USA to question Gill's authority. Because Gill had not signed the Captive Management Agreement or, as far as the record reflects, the endorsement, Gill assumed a new role by serving as NT's signatory on the USA Release. Additionally, unlike in prior dealings, USA did not receive any correspondence reflecting NT's knowledge of the USA Release. Finally, and perhaps most significantly, USA knew Gill had violated the NT board's resolution authorizing only Lapointe to sign a NT check. Although other evidence in the record supports a finding that USA reasonably relied on Gill's apparent authority, the facts also support a finding that USA's reliance on Gill's apparent authority was not reasonable absent inquiry to the board.

¶ 40 For these reasons, we decide material issues of disputed fact exist regarding Gill's actual or apparent authority to bind NT to the USA Release. Summary judgment in favor of USA is therefore inappropriate, and we reverse and remand for additional proceedings. Because the adequacy of consideration may arise on remand, we address the propriety of the court's ruling on that issue.[8]

**B. Consideration**

¶ 41 "Consideration" is generally defined as "any benefit to the promisor or detriment to the promisee." *Hill v. Chubb Life Am. Ins. Co.*, 182 Ariz. 158, 164, 894 P.2d 701, 707 (1995) (quoting *USLife Title Co. of Ariz. v. Gutkin*, 152 Ariz. 349, 354, 732 P.2d 579, 584 (App.1986)). We presume written promises are supported by consideration. A.R.S. § 44–121 (2003) ("Every contract in writing imports a consideration."). When a contract "contains mutual promises and is in writing," consideration will almost always be adequate. *Lessner Dental Labs., Inc. v. Kidney*, 16 Ariz.App. 159, 160, 492 P.2d 39, 40 (1971).

¶ 42 In this case, NT and USA mutually agreed to release each other from all known and unknown claims that may have existed on the effective date of the USA Release. Although neither party may have had a particular claim or action in mind when it signed the release, both offered consideration in the form of the detriment of not being able to pursue any legal claim or cause of action they might have against one another. This court has recognized that "[t]he release of a disputed or doubtful claim is legal consideration." *McGrath v. Bill Johnston Golf Prop., Inc.*, 13 Ariz.App. 49, 52, 474 P.2d 56, 59 (1970). The fact that any potential claims against the parties may never have come to fruition does not affect the legal sufficiency of releases as consideration. *Id.* The trial court did not err by ruling as a matter of law that the USA Release is supported by consideration.

8. NT also argues the parties lacked a "meeting of the minds" when Gill and Lapointe signed the USA Release. Because NT failed to raise this issue to the trial court, however, it has waived it for purposes of appeal, *Regal Homes*, 217 Ariz. at 171, ¶ 52, 171 P.3d at 622, and we decline to address this issue.

## III. Attder Fees on Appeal

¶ 43 All parties request an award of attorney fees pursuant to A.R.S. § 12–341.01(A) (2003), which authorizes us to award fees to the successful party on a claim arising out of contract. NT's claims did not arise from contract as NT did not allege L & C failed to perform; it alleged L & C negligently performed. *Keonjian*, 216 Ariz. at 566–67, 169 P.3d at 930–31 (noting legal malpractice claims generally are tort claims absent "specific promise[s] contained in the contract ... and then only to the extent the claim is premised on the nonperformance of that promise" (citation omitted)). We therefore deny L & C's request, but award it taxable costs as the prevailing party against NT.

¶ 44 Although NT is successful on its challenge to the entry of summary judgment on its breach-of-contract claim against USA, NT has not yet prevailed on that claim. We therefore deny its request. The trial court may award fees expended on appeal to either NT or USA upon resolution of NT's claim. We award NT its taxable costs as the prevailing party on appeal against USA. *See Henry v. Cook*, 189 Ariz. 42, 44, 938 P.2d 91, 93 (App.1996) (holding that party obtaining partial success on appeal is entitled to recover all taxable costs).

### CONCLUSION

¶ 45 For the foregoing reasons, we affirm summary judgment in favor of L & C. Because material issues of disputed fact exist concerning the propriety of USA's accord-and-satisfaction defense to NT's breach-of-contract claim, we reverse the summary judgment in favor of USA and remand for additional proceedings. We deny all parties' requests for attorney fees. The trial court may award attorney fees expended in this appeal as between NT and USA upon resolution of the lawsuit.

CONCURRING: PATRICK IRVINE and DANIEL A. BARKER, Judges.