NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

WIN INVESTMENTS LLC, *Plaintiff/Appellee*,

*v.*

THEODORE JOSEPH SEGAL, *Defendant/Appellant*.

No. 1 CA-CV 18-0646
FILED 10-24-2019

Appeal from the Superior Court in Maricopa County
No. CV2018-001218
The Honorable Roger E. Brodman, Judge

**AFFIRMED**

COUNSEL

Thomson Law PLC, Phoenix
By Neil W. Thomson
*Counsel for Plaintiff/Appellee*

Davis Miles McGuire Gardner PLLC, Tempe
By David W. Williams
*Counsel for Defendant/Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Randall M. Howe delivered the decision of the Court, in which Judge David D. Weinzweig and Chief Judge Peter B. Swann joined.

---

**H O W E**, Judge:

¶1             Theodore Joseph Segal appeals the trial court's order granting WIN Investments LLC's motion to enforce settlement. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2             In February 2018, WIN sued Segal seeking, among other things, a declaratory judgment concerning the legal ownership of 50,000 shares of common stock in The Alkaline Water Company, Inc. In early May 2018, Segal authorized his lawyer, David Williams, to settle the lawsuit. Segal offered to sell the contested Alkaline shares to WIN or WIN's manager, Richard Wright, for $0.75 per share in exchange for a complete release and voluntary dismissal of claims. Williams then conveyed the offer via email to Neil Thomson, counsel for WIN and Wright.

¶3             Williams met with Segal on May 16 to "discuss[] the status of [settlement] negotiations" with Wright. He informed Segal that Wright "did not appear to be interested" in purchasing the Alkaline shares. Segal responded that since Wright had apparently rejected the offer, he would still "consider" transferring his shares to Wright or WIN "in exchange for resolving the present lawsuit."

¶4             Later that day, Williams called Thomson to ask whether his clients were interested in purchasing the shares at a lower price, but Thomson said that they were not. Williams then proposed exchanging the shares for WIN and Wright's voluntary dismissal of all claims with prejudice. Williams immediately followed the conversation with an email to Thomson, setting forth the written terms of Segal's second "authorized" settlement offer.

¶5             On May 21, Thomson emailed Williams, stating that his client had authorized him to accept Segal's offer as set forth in Williams's May 16 email. To effectuate the legal transfer of the shares, Thomson attached a

"Proposed Stipulation to Dismiss with Prejudice," "Stock Power Form," and "Instruction Letter."

¶6　　　　That same day, Williams met again with Segal to discuss the status of negotiations. Williams told Segal that he had extended the second offer. Williams noted that WIN and Wright had never "actual[ly]" rejected the first offer, and Williams "had learned of the purported rejection from" another Alkaline stockholder. Segal then instructed Williams to withdraw the second offer because his interest in returning the shares as the second offer proposed "was based on Mr. Wright's actual rejection of the 75 per cent share offer." Williams consequently sent Thomson an email withdrawing the May 16 offer.

¶7　　　　WIN then moved to enforce the settlement agreement, arguing that it reasonably relied on Williams's apparent authority to make the second settlement offer and that WIN had unconditionally accepted it. Segal countered that Williams lacked apparent authority to convey the second settlement offer. He also characterized WIN's acceptance as a counteroffer.

¶8　　　　The court heard oral argument on the motion in August 2018. It also received exhibits, including several emails between Thomson and Williams and declarations from Segal, Williams, and Thomson. In his declaration, Segal attested that he had expressed "interest" to Williams in "possibly" returning the shares and ending the lawsuit since he was having health issues from a recent surgery. He attested further that although he expressed "interest" in returning the shares in exchange for dismissing the lawsuit, he did not "recall actually expressing to Mr. Williams authorization to convey such an offer." Williams attested that he had called and then later emailed Thomson, telling him that Segal was "interested" in returning the 50,000 shares "in exchange for dismissal of the case."

¶9　　　　The trial court granted the motion to enforce the second settlement, ruling that Williams had apparent authority to extend the settlement offer and that WIN had validly accepted that offer. The court noted that Williams was "counsel of the record," which cloaks an attorney "in and of itself" with authority to make offers. It also noted that the first settlement offer indicated Williams was making the offer on Segal's behalf and that Williams had called Thomson on May 16 to personally discuss the second offer before issuing it. Segal timely appealed.

**DISCUSSION**

**¶10**        Segal claims that the trial court improperly granted WIN's motion to enforce the settlement agreement because Williams lacked both actual and apparent authority to bind him to the agreement and that WIN's May 21 email was not an "unconditional acceptance." This Court reviews the grant of a motion to enforce a settlement using the same standards as employed for summary judgment. *Robertson v. Alling*, 237 Ariz. 345, 347 ¶ 8 (2015). Under that standard, we must determine de novo whether the trial court correctly applied the law and whether any genuine disputes of material fact exist. *Dayka & Hackett, LLC v. Del Monte Fresh Produce N.A., Inc.*, 228 Ariz. 533, 536 ¶ 6 (App. 2012). Because the parties argued below only whether Williams had apparent authority, and the trial court ruled only on that issue, we will not consider whether Williams had actual authority to make the settlement offer. *See Hogue v. City of Phoenix*, 240 Ariz. 277, 281–82 ¶ 16 (App. 2016) (issues raised for the first time on appeal are untimely and deemed waived).

**1. Apparent Authority**

**¶11**        The principles of agency law govern the attorney-client relationship. *Robertson*, 237 Ariz. at 348 ¶ 16. Generally, an agent can bind a principal only when he or she acts with actual or apparent authority. *Best Choice Fund, LLC v. Low & Childers, P.C.*, 228 Ariz. 502, 510–11 ¶ 26 (App. 2011). Apparent authority is "the power held by an agent or other actor to affect a principal's legal relations with third parties[.]" Restatement (Third) of Agency § 2.03. Although the mere act of retaining an attorney in a litigated matter "does not by that conduct alone" create apparent authority to bind a client to a settlement, *id.* at § 3.03, cmt. b., an attorney may settle a case on behalf of a client if the other settling party "reasonably assumes that the lawyer is authorized to do that act on the basis of the client's (and not the lawyer's) manifestation of such authorization." *Robertson*, 237 Ariz. at 349 ¶ 17.

**¶12**        Apparent authority may be shown where a principal "direct[s] or designat[es] an agent to perform acts or conduct negotiations . . . or plac[es] the agent in charge of a transaction or situation." Restatement (Third) at § 2.03, cmt. c. Similarly, "[i]f a principal has given an agent general authority to engage in a class of transactions, subject to limits known only to the agent and the principal, third parties may reasonably believe the agent to be authorized to conduct such transactions and need not inquire into the existence of undisclosed limits on the agent's authority." *Id.* at § 3.03, cmt. b. Silence or inaction may show apparent

authority "when, in light of all the circumstances, a reasonable person would express dissent to the inference that other persons will draw from silence." *Id.* at § 1.03, cmt. b.

**¶13**      Applying these principles, the settlement was appropriately enforced. The record shows that Segal retained Williams to represent him as "counsel of record" and directed him to negotiate a settlement. Segal expressly authorized Williams to make the first settlement offer and Williams made the offer. And while Segal now calls it a "misunderstanding," Segal also told Williams that he was "considering" and "interested" in transferring the Alkaline shares in exchange for resolving the lawsuit. Williams also made the second offer. Given these facts, WIN "reasonably assume[d]" that Williams was authorized to act on Segal's behalf. *Robertson,* 237 Ariz. at 349 ¶ 17.

**¶14**      Furthermore, Segal never informed WIN that Williams's authority was limited in any way before accepting the second offer, nor had he told Williams to discontinue discussing settlement efforts. After authorizing Williams to make the first offer, Segal should have realized that WIN would believe that Williams had authority to act on his behalf. Thus, the trial court did not err in finding that Williams acted with apparent authority when he made the second offer.

## 2. Acceptance

**¶15**      Segal asserts that WIN's May 21 email was a counteroffer rather than an acceptance. Under general contract principals, an acceptance must be unequivocal and on virtually the exact same terms as the offer; any attempt to accept the offer on terms materially different than those in the original offer constitutes a rejection and counteroffer. *United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 270–71 (App. 1983). Here, as the trial court recognized, the preprinted forms pertained only to legally effectuating the transfer of the shares from Segal to WIN and did not materially alter the contract. The May 21 email thus was not a counteroffer.

**CONCLUSION**

**¶16** For the foregoing reasons, we affirm. Both parties request attorneys' fees and costs incurred on appeal. In our discretion, we decline to award attorneys' fees. As the prevailing party, however, WIN is entitled to costs on appeal upon compliance with Arizona Rule of Civil Appellate Procedure 21.



AMY M. WOOD • Clerk of the Court
FILED: AA